Next on our argument calendar today is Love v. United States. Mr. Fox. Good morning, Your Honors. My name is Ed Fox. I represent the plaintiff appellate this case. This case comes here from an FTCA bench trial for medical malpractice against the VA. Plaintiff had alleged that the defendant failed to review and appropriately follow up in an abnormal urinalysis that was suggestive of a urinary tract infection and about a month and a half later, the plaintiff went into septic shock leading to a heart attack and hospitalization. The defendants had lost or overlooked somehow reviewing the UA, the urinalysis. As a result, the defendant's defense of this was that it didn't matter because even if they had reviewed it, it would not have required follow-up. Well, that's what the person who should have reviewed it testified to, right? She said based on the history and what it showed, I wouldn't have ordered anything further. No, nobody knows who, nobody reviewed it. So the person who testified... No, I know, but they called this woman who was the one who was assigned to do these types of reviews and she testified along the lines that I just said. Correct. And that's correct. And she did a 180 from her deposition. So four questions in a row, she testified exactly opposite that she testified in her deposition and changed her testimony from that she would have reviewed it to she wouldn't have reviewed it. But yes, that did happen. Which, honestly, since this is a bench trial, I mean, I know that's frustrating when something like that happens, but wasn't the judge entitled to credit whichever version the judge wanted to? Sure, of course, and that was one issue. But the issue, the trial and the court said this in its opinion, that the trial really focused on competing expert opinions of what should have been reviewed or not. So even if it would have been true that she would have reviewed it, and she wouldn't have done anything, it wasn't reviewed. And the opinions of our side were that it should have been reviewed and followed up upon. So even if she said she wouldn't have, the expert opinion was she should have. But there was expert opinion to the effect that, overall, what happened satisfied the standard of care. I know we kind of took this detour into whether Illinois law applies on this and whether this Illinois rule about nurse practitioners. I mean, frankly, the government does raise this in its brief. This was a case in federal court. I have trouble understanding why the federal rules of evidence aren't the source of law here. Well, even the, there's a Seventh Circuit case law that says that under the FTCA, you apply federal law. You're talking about Gibson, I think. I'm sorry? I think you're talking about the Gibson case, but I don't think it was looking at something like this expert witness question, which is deeply embedded in Rule 702. Be nice if people stopped talking about Daubert at some point, but it's a Rule 702 issue. And on top of that, even if it were Illinois law, I don't see, I can well understand if an expert said, I don't think the nurse practitioner met the standard of care and was unfairly holding the nurse practitioner to the standard that a specialist would use. That would be a problem. But if the specialist, here the urologist, Dr. Coogan, says, I think the nurse practitioner did everything compatibly with the standard of care. I don't see any harm in that. So maybe you could address that. Well, I guess that overlooks a few things. One, it overlooks, and then putting aside for a minute the issue that the expert shouldn't have been allowed to testify to a nursing standard of care. But if the expert is saying she actually met the urologist standard of care, you know, so by definition, she also met the nurse practitioner standard of care. But under Illinois law, that's not the way they look at it. So under Illinois law, there is this WINGO exception. I think maybe they do look at it in appropriate circumstances. And with all due respect, Judge, the WINGO exception is very, very narrow and it's been confined to its facts. And those facts were that there was a communications issue amongst nurses, between nurses and doctors who are in a surgical team and communicating with each other. And even in the WINGO case, they said this was not a nursing procedure, it was a communications issue. So that case has been very strictly confined. In every case in Illinois following Sullivan, it's held a doctor can't testify to a nursing standard of care. Which strikes me as a rule that the Illinois courts have, I'll go back to my earlier point, a rule the Illinois courts made for themselves. And even if the Sullivan rule applies here, I remain unconvinced that the way it happened here was in the slightest bit prejudicial to your client. Well, look, here's the issue. Here's one of the problems with that. In this case, Nurse Petrella, who was plaintiff's primary care nurse in June, four months before the October exam where the urinalysis was lost, she was confronted with almost exactly identical circumstances. She was confronted with a urinalysis. It was almost identical to the one in October and she did exactly the opposite. No, right. And the doctor says what she did is fine too, but it wasn't the only response to this situation, especially as data accumulates. So he said she's acting within the standard of care, but so is the later nurse practitioner. So, Judge, I beg to differ with you on that because that's what the judge said, but that wasn't the testimony. So what happened with that testimony, right? But what happened with that because that was such a big hole in their expert's testimony that Nurse Petrella did something opposite of what he said. I kept pushing him on that point and the judge said, and at first, Dr. Coogan said, well, it was within the standard of care. We're not required by the standard of care. I kept pushing him on that. And then later on in his testimony, he said, hold it. Just a minute. Judge Easterbrook has something. Perhaps you think you've already addressed this in response to Judge Wood's question, but what you're now making the kind of argument you're now making is the kind of argument you might have made to the district court, but the district court made findings of fact and conclusions of law and your need is to show why they are clearly erroneous. Not just to repeat your fundamental argument. Is there any reason why the district court's findings are clearly erroneous? Well, yes, in this context that we're talking about now because that wasn't the ultimate testimony of their expert. The ultimate testimony of their expert was that she did that the nurse Petrella did violate the standard of care because you don't, according to him, you don't treat asymptomatic bacteria. And the reason why according to him was because you give unnecessary antibiotics. You're just repeating your argument. The district court gave reasons for not accepting that line of argument. Why are those reasons clearly erroneous? Well, the district court disregarded that, didn't address that at all. Actually, I don't know what else to say other than the district court just didn't address the fact. It wasn't that he said it was within the standard of care. Or was it required by the standard of care? Dr. Coogan said that was not the standard of care. That violated the standard of care. What Dr. Coogan says is there are a couple of things you could do, which is very common in medicine. So, you know, it's not like there's only one response to the situation. And there's a lot of discussion in the district court's opinion of how many tests were run and that there was a somewhat confounding situation. He had the enlarged prostate as well, which was consistent with some of the other things. And so we have expert testimony, credited by the district court judge, that the actions by the people that your client saw were reasonable medical responses. Maybe not the only one. And maybe somebody else might have detected something, but that doesn't mean there's malpractice. It means you're acting within the standard of care. Well, there was just a pattern of adopting facts that led to opinions that were not facts. So on the point that you just raised with the symptoms and the BPH issues, the court adopted the fact that he had ongoing symptoms from 2007. That was not the evidence, though. Well, he explains what evidence he's relying on. He says there's an indicator in 2007 of this, but then Mr. Love is, whatever his name is, Vargas Love, is getting treatment outside, but the medications that he's been prescribed are an indicator that he's still getting treated for that. I mean, the judge, in other words, I'm just sort of rehearsing the ones that pop into my mind of the reasons that the judge gave. Your Honor, the judge base is ruling on, he saw treaters on the outside and there's records that were missing and there might be records that show he had these symptoms during those years. But he's getting the medications that are appropriate for that condition. Right. He was, and the medications, the testimony was that the medications were effective at dealing with the symptoms. And in fact, his primary care doctor testified that there were no symptoms. That was, she's the one in the best position to know. She tested, nobody else knew. There was no record of it. And she testified there were no symptoms and the medication that he was taking for the one symptom she noted, which was stress incontinent, was controlling the symptom. That was the evidence. There was no other evidence that there were symptoms going on. There was no record of it. And to say there's outside records that might have had something in it. It's just rank speculation and respectfully, if a party were to say something equivalent to that in a summary judgment motion, say, well, there's a, there might be a fact here because there's missing records and they might show the fact, you know, that wouldn't fly. It just wouldn't, it doesn't fly because it's just rank speculation. So that's the problem that I'm trying to point out. And is that there's just no factual basis for these things. And it just, you know, it just happened in an ongoing fashion when, for example, when Dr. Fernandez testified to the nursing notes, he was testifying without foundation to knowing what the nursing notes were. I objected twice to it. He has no foundation to know what the nursing notes were. The nurse who wrote the notes testified about it and he's in direct conflict with her. And that was overlooked. I don't see how any judge could just permit somebody to testify without a foundation for testimony and the courts are supposed to, you know, the case law is replete with cases that say when an expert makes an opinion on causation, you're supposed to look behind it and see if there's a factual foundation for it. And when an expert testifies to something to which he has no foundation and contradicts the testimony of somebody who did the work, who actually knows the work, that's just inappropriate and it's just not a fair reading of the facts. And I can give you other examples, you know, what the court also did in its opinion when it decided that it said, you know, the ultimate conclusion, the court said the evidence tips slightly in favor of the defendants, Dr. Coogan, and therefore the defense wins. And then the reason the judge gave for it is he says, and this is because some of the issues were centered on BPH and Dr. Fox plaintiff's expert was an infectious disease expert and he didn't know about BPH. That was really wrong and it was not fair. And this is why it was wrong and not fair because before the trial, the judge had us all, told us all to send our CV, the expert's CV to the court and he wanted us to limit our questions of the expert's background. So not to take up so much time. So when I was examining my expert about his credentials at a certain point, the judge discouraged me from continuing saying I got the CV. You don't have to do any more than that. Dr. Fox's knows about BPH. The defense never cross-examined him about BPH. It never even came up. It never came up at all that he didn't have knowledge about it until the judge wrote about it in his opinion. And the fact that it didn't come up was because we weren't supposed to continue on with testimony about their expertise because the judge wanted to cut it short and he had the CV. So to make an inference that Dr. Fox was an infectious disease expert and he wouldn't know about BPH was just wrong because an infectious disease expert has to be able to distinguish between infectious disease and non-infectious disease and he has to know about both. So it was those kinds of things, you know, respectfully it just wasn't right to do it and it was just no basis to make an inference, especially when the defense never questioned it during the course of the trial. It never came up. So the judge decided, according to his opinion, he decided in favor of defense saying Coogan was better qualified because he would know about BPH. Fox wouldn't because Fox is an infectious disease guy and there was literally no evidence about that. So, you know, I see my time is almost up and I'd like just to reserve what's left for rebuttal. Certainly, counsel. Mr. Archer. Good morning, your honor. Counsel, I may plead the court. The district court did not err in allowing Dr. Coogan, a board-certified urologist, to testify on the standard of care of screening, diagnosing, and treatment of a urologic condition. There are four reasons why the court did not err in making that determination. First, the argument was waived because it was not timely raised with the district court on not one but two occasions. Second, Mr. Vargas retained an infectious disease doctor who, like Dr. Coogan, was not a nurse practitioner to opine on the standard of care for screening, diagnosing, and treating UCI. So, how do you pronounce your last name? Arce or Arce? Good morning, your honor. Arce, A-R-C-E. Arce, okay. So, Mr. Arce, the government does include in its brief a bit of a discussion about whether it's appropriate to worry about this Illinois doctrine under Sullivan and maybe as modified by Wingo about being able to testify only inside your own area of licensure. And so, therefore, a doctor couldn't talk about a nurse practitioner. But is it the government's position that this is a matter for Illinois law or for the federal rules of evidence, which have no such rigid rule? Well, your honor, I would say that the two, the principal espoused in Sullivan and then its progeny, are actually not in conflict with Rule 702 or Daubert because Rule 702 requires that a witness be qualified as an expert by knowledge, skill, experience, training, and education, which is what Sullivan mandates, that the expert be competent in the relevant field at that issue in that particular case. And so, I don't think that the rigidity of Sullivan translates to federal cases, but the general principle still applies, which is why the Wingo exception is instructed here, where that rigidity can be broken if it can be shown at trial that there is no significant difference between the standard of care between one discipline and the other. And so, in this case, as argued in front of the district court judge several times, there was no difference between the standard of care in screening, diagnosing, and treating UTI between a nurse practitioner or a urologist. In fact, there was ample evidence at trial that the patient who visited the urology clinic at the Heinz VA were seen by one of three types of providers, either a nurse practitioner, a resident, or an attending physician. And who the patient saw on that particular day was not dependent on the condition that they presented. It was dependent on when they happened to walk in the clinic and who they saw. So, it would make no logical sense that had Mr. Vargas arrived at the clinic five minutes earlier or five minutes later and had been seen by a licensed physician, that that physician would then suddenly be held to a different standard of care. And so, again, which points to the reason why Vargas relied upon the testimony of an infectious disease doctor in setting the standard of care for a nurse practitioner for screening and diagnosing a UTI. And this logical inconsistency was pointed out to the district court judge after the infectious disease doctor testified. And the district court judge noted in between witnesses that Vargas' efforts to have this infectious disease doctor testifying this subject severely undercut the argument they made at the 11th hour before trial to bar Dr. Kugin from testifying. And judge, the fourth reason why Dr. Kugin did not testify, which is exactly what you had mentioned earlier, Judge Wood, that the policy behind Sullivan, even if the court were to find that the rigidity in Sullivan applies to federal cases, which I do not think it does, but even if Sullivan were to be applied in this case, the policy behind that rule is to prevent a higher standard of care from being imposed on a treater. And in this case, the district court judge, again, following the logic proposed by Vargas, noted that under this higher standard of care for a urologist, the nurse practitioner in this case, still met the standard of care in choosing not to treat Mr. Vargas for what she determined and what the expert, in this case, Dr. Kugin, determined was asymptomatic bacteria. And so for all four of those reasons, it was completely appropriate and proper for Dr. Kugin to testify in this case as to the standard of care. I'd like to address a few of the points raised by counsel a few moments ago in regards to the BPH. I understand that Mr. Vargas, his argument is that the symptoms that he presented at the urology clinic on October 2nd, 2015, were not related to his long-standing BPH issues. But that argument is rebutted by the mountain of evidence in this case, including all of his medical records from the VA and also by Mr. Vargas himself. At trial, Mr. Vargas admitted that before he walked into the urology clinic that day, he had been diagnosed with BPH and he had testified that he was taking medication to deal with the symptoms that are associated with BPH. And that testimony by itself puts this issue to rest. But even if we were to set aside Mr. Vargas' testimony, the medical records also show that Mr. Vargas has had BPH since at least 2007, and BPH with the lower urinary tract symptoms that are commonly associated with it. And so Dr. Coogan testified at trial that BPH, which is an acronym for an enlarged prostate, is typically diagnosed in three different ways. You either have a pathological diagnosis, which you stick a needle in the prostate to see if it's enlarged. You have a radiographic diagnosis, which is when there's a cystoscopy performed to see if the prostate is enlarged, or you can diagnose an enlarged prostate through the symptoms presented by the patient. And starting in at least 2007, Mr. Vargas was diagnosed with enlarged prostate using two of those criteria. One, a cystoscopy revealed an enlarged prostate, and two, he was complaining of lower urinary tract symptoms. And so from 2007 all the way to 2015, Mr. Vargas' medical records show that one, he had a consistent diagnosis of BPH, and two, he was taking the two medications that were prescribed to specifically treat the symptoms associated with that condition. And so there is an argument presented that the medical records are devoid of any of these lower urinary tract symptoms until October 2015 during that urology clinic visit. But there's an explanation for that offered by nurse practitioner Beeser who saw Mr. Vargas on the day in question. And there's also an explanation provided by Vargas' own infectious disease doctor, Dr. Fox, who testified that it makes sense that the nurse practitioner who saw Vargas on the day in question took such copious notes about Mr. Vargas' urologic condition because one, she's a specialist. And then two, it was Mr. Vargas' first visit to this specific provider. And then three, it was Mr. Vargas' first visit to the Hynes Urology Clinic in quite some time. So she took a complete and total history, including information from Mr. Vargas and also a detailed look at his past visits to the urology clinic. And given the level of detail and specificity in the notes, nurse practitioner Beeser's explanation that if those symptoms had worsened over time, or if they were different than what they were before, she would have noted that. And the district court judge credited her testimony and he was not clearly erroneous in doing so. And so the symptoms that were presented in October 2015 were related to his long-standing lower urinary tract symptoms that were being treated with medication. Now, it's true that one of the medications was changed and that medication was changed simply because there was a newer generic that was available to veterans through the Hynes VA. And then the second medication was also changed. It was decreased a bit and that was to address Mr. Vargas' hesitancy issues. But as nurse practitioner Beeser noted at trial, which went unrebutted, hesitancy is not a symptom of a UCI. So there was no clinical information that Mr. Vargas had a UCI in October of 2015. Now, I also want to address the notion that the conduct of nurse practitioner Petrella somehow informed what the providers at the urology clinic should have done in October. It is not true that the presentation of Mr. Vargas in June of 2015 was the same as October 2015. The only thing that was the same was one, it was the same patient and two, the urinalysis results were similar, but the clinical presentation was entirely different. When nurse practitioner Mary Petrella saw Mr. Vargas in June of 2015, he had just come off of two major back surgeries, one in April or one in May, my apologies, one in April. And during the April back surgery, they found that there was a fractured vertebrae. So they had to go back in and conduct another surgery several weeks later. And there were complications related to those two surgeries that required Mr. Vargas to be hospitalized for 30 days. And so nurse Petrella in reviewing those records thought that it was more likely than not that Mr. Vargas had been catheterized throughout those 30 days. And given that he was catheterized throughout those 30 days, it was very likely that he was put at a higher risk of having an infection. So given that clinical presentation, she made the decision to prescribe antibiotics, which our retained urologists noted did not violate the standard of care. Again, the clinical presentation was different from what we saw in October of 2015. And then finally, Your Honor, I do want to address briefly the opinion offered by the orthopedist. First, Dr. Fernandez, the United States retained orthopedist, had the foundation to opine about the nursing notes that indicated whether or not Mr. Vargas had any swelling while he was hospitalized. He had just as much foundation to opine on those records as Mr. Vargas's retained orthopedist, Dr. Hefner, who also commented on those nursing notes. They had the same general background and education to be able to testify about pitting versus not pitting edema. And on that note, Dr. Hefner, Vargas's retained orthopedist, opined that there's no material difference between pitting and not pitting edema, which severely undercuts the argument that Vargas advances now. And then finally, Judge, even if Dr. Fernandez were not competent to opine on the nursing notes, they don't materially alter his opinion anyway. As Dr. Fernandez opined at trial, Mr. Vargas would have had to have sustained severe and prolonged and sustained swelling in order for Mr. Vargas to develop the severe carpal tunnel syndrome that he did. None of the medical records, including the nursing notes, indicated that the swelling that Mr. Vargas experienced, if any, was anything but moderate. And in fact, the doctor's notes from the 10-day stay for Mr. Vargas all indicated, every single one of them, that Mr. Vargas did not have any swelling in his extremities whatsoever. And that's what Dr. Fernandez based his opinion on. And so he was competent to testify. He testified, and the district court judge did not clearly err in crediting that testimony over the testimony of Mr. Vargas's retained orthopedic surgeon. And unless there are any other questions, I ask that you affirm the decision of the district court. Thank you. Thank you, Counsel. Anything further, Mr. Fox? Yes, Judge. I just want to reiterate, you know, under the Wingo case that is being brought up predated Sullivan. And under Illinois law, Supreme Court law, under Sullivan, there is no way that Coogan would be allowed to testify to a nursing standard. And if you just look at the cases, that's the only conclusion you can come to. The second point is about the symptoms and BPH. Simply put, there is no evidence in the record that he had any symptoms from 2007, between 2007 and 2015. And the only person in a position to know is primary nurse practitioner Petrella testified that he didn't have any symptoms with her. And the one symptom that she had, that she noted questionable stress incontinence was old and was being controlled by medication. And finally, you know, the clinical picture in October was not materially different as it was in June, especially because it was even more compelling in October. Because by October, you also had the June results, which were a second abnormal UTI plus a diagnosis of a UTI plus antibiotics, which would predispose him to further problems. So with that, I rest. Thank you. Thank you, counsel. The case is taken under advice.